## WYOMING *v.* COLORADO.

No. 10, original, October Term, 1935. Argued February 26, 27, 1940.—Decided April 22, 1940.

*Mr. Ewing T. Kerr,* Attorney General of Wyoming, with whom *Messrs. Harold I. Bacheller,* Deputy Attorney General, *Arthur Kline,* Assistant Attorney General, *James A. Greenwood,* and *W. J. Wehrli* were on the brief, for complainant.

*Mr. Byron G. Rogers,* Attorney General of Colorado, with whom *Messrs. Ralph L. Carr,* Governor, *Henry E. Lutz,* Deputy Attorney General, *Schrader P. Howell,* Assistant Attorney General, *Clifford H. Stone, Jean S. Breitenstein, Albert P. Fischer, Robert G. Smith,* and *Lawrence R. Temple* were on the briefs, for defendant.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The State of Wyoming sought leave to file its petition for a rule requiring the State of Colorado to show cause why it should not be adjudged in contempt for violation of the decree in this suit, restraining diversions of water from the Laramie river. 259 U. S. 419, 496; 260 U. S. 1; 286 U. S. 494; 298 U. S. 573.

In response, Colorado asked that evidence be taken to determine the amount of return flow to the Laramie river from the diversions at the headgates of meadowland ditches and that Colorado have credit therefor. This matter had been considered by the Court in framing its

decree (298 U. S. pp. 581, 582) and the motion was denied. Leave was granted to Wyoming to file its petition and Colorado was directed to show cause accordingly.

Two returns have been filed on behalf of Colorado, one by the Governor of the State setting forth his executive order directing the withdrawal of the appearance of the Attorney General and appointing special counsel to represent the State, and another return by the Attorney General who challenges the authority of the Governor to supersede him. In the view we take of the material matters presented, we find no such differences between the two returns as to require us to determine the question of authority.

Wyoming charges that from May 1, 1939, to June 18, 1939, Colorado diverted from the Laramie river 39,865.43 acre feet, that is, somewhat in excess of the total of 39,750 acre feet allocated to Colorado by our decree; that thereupon, and on June 19, 1939, Colorado closed the headgates of the various ditches involved; that on June 22, 1939, in violation of the decree, Colorado opened the headgates and permitted the diversion between June 22, 1939, and July 11, 1939, of 12,673 acre feet in excess of the 39,750 acre feet allowed; and that in particular, with respect to meadowland ditches, Colorado permitted the diversion between May 1, 1939, and July 11, 1939, of 24,775 acre feet above the 4250 acre feet (measured at the headgates) specifically allowed for the meadowland appropriations. 298 U. S. p. 586.

In defense, Colorado contends that the meadowland diversions in excess of 4250 acre feet were in accordance with Colorado law and were not inconsistent with the decree of this Court until a diversion by Colorado from the Laramie river for all purposes reached the allocated total of 39,750; that the diversion of an amount greater than that total during the period above specified was with

the acquiescence of Wyoming; and that Wyoming has not been injured.

Colorado pledges that hereafter its officials will administer the flow of the Laramie river in that State in accordance with Colorado laws and adjudication decrees until a total amount of 39,750 acre feet, measured at the headgates, has been diverted, and, when that total has been reached in any year, Colorado can and will close the headgates and keep them closed during the remainder of the irrigation season.

In support of the contention that the diversion of more than 4250 acre feet for the meadowland appropriations should not be regarded as a violation of our decree, if the aggregate diversions in Colorado do not exceed the total allowed, Colorado presents a declaratory judgment of the District Court of that State for the County of Laramie, entered February 2, 1939, in the suit of *Adelrick Benziger* v. *The Water Supply & Storage Company, et al.* That suit was brought on behalf of the meadowland appropriators in Colorado, and the defendants were the other appropriators in that State whose respective appropriations had been the subject of consideration in the suit in this Court. Our rulings were examined by the state court which concluded that they were intended to, and did, determine only the relative rights of the two States to divert the waters of the Laramie river and its tributaries and that it was not our purpose to withdraw the appropriations and water claims in Colorado from the operation of its local laws or to restrict the utilization of the waters in any way "not affecting the rights of the State of Wyoming and her water claimants." Accordingly the state court held that the fixing in our decree of the meadowland appropriations was intended only to bear upon the relative rights of the States and was not intended to be an adjudication of the relative rights of the decreed appropriations in Colorado; hence, that so

long' as the aggregate of the water diverted in Colorado does not exceed the total of 39,750 acre feet accredited to the Colorado appropriations, as stated, they are subject to the laws of Colorado. In that view the Court adjudged that the meadowland appropriators and the defendant appropriators were entitled to divert according to their respective priorities until they reached the amount of 39,750 acre feet, and that when that amount had been diverted "all headgates are to be closed for the balance of the season."

A review of our decisions confirms the construction thus placed upon them. Suit was brought in 1911 to prevent a proposed diversion in Colorado of the waters of the Laramie river, an interstate stream. Voluminous evidence was taken, the case was thrice argued, and a final decision was rendered in 1922. 259 U. S. 419. After an elaborate consideration of the physical features of the region and the principles applicable to a determination of the rights of the respective States, the Court concluded that as both States had adopted the doctrine of appropriation, it was equitable to apply that doctrine and to determine their respective rights according to the rule of priority. The Court examined the evidence with respect to the flow of the stream, its variations, and other relevant matters, and found that the available supply—288,000 acre feet—was not sufficient to satisfy the Wyoming appropriations and also the proposed Colorado appropriation. The Court found that there were some existing Colorado appropriations entitled to precedence over many of those in Wyoming. These included 18,000 acre feet for what was known as the Skyline Ditch and 4250 acre feet for meadowland appropriators. These were not to be deducted, as the 288,000 acre feet was the available supply after they were satisfied. The proposed Colorado appropriation which was in controversy in the suit was that known as the Laramie-Poudre Tunnel di-

version, a part of an irrigation project known as the Laramie-Poudre project. The evidence showed that the Wyoming appropriations having priorities senior to the one in Colorado, and which were dependent on the available supply above specified, required 272,500 acre feet. Deducting that from the available 288,000 acre feet there remained 15,500 acre feet which were subject to the proposed appropriation in Colorado. Accordingly a decree was entered enjoining the defendants from diverting more than 15,500 acre feet annually from the Laramie river through the Laramie-Poudre project. The decree provided that it should not prejudice the right of Colorado, or of anyone recognized by her as entitled thereto, to continue to divert 18,000 acre feet through the Skyline Ditch and 4250 acre feet through the meadowland appropriations. 259 U. S. pp. 496, 497. Soon after, this decree was modified so as not to prejudice a diversion by Colorado for the Wilson Supply Ditch (260 U. S. 1), a diversion which amounted to 2000 acre feet. 298 U. S. p. 580. In this way the total allowed to Colorado amounted to 39,750 acre feet.

In 1931, Wyoming brought another suit in this Court, alleging that Colorado was permitting excessive diversions and seeking the protection and quieting of Wyoming's rights under the former decree. Wyoming asked provision for accurately measuring and recording the quantities of water diverted and also an injunction restraining excessive diversions, if it were held that the former decree related only to the diversion by the Laramie-Poudre Tunnel appropriation. Motion to dismiss the bill was denied. We held that the former decree should be taken as determining the relative rights of the two States, including their respective citizens, to divert and use the waters of the Laramie and its tributaries; that the limited injunction did not warrant an inference that it marked "the limits of what was intended to be decided," but that the .

decree did define the quantity of water which Colorado and her appropriators might divert "from the interstate stream and its tributaries and thus withhold from Wyoming and her appropriators." 286 U. S. 494, 506–508.

Final hearing was had and the case was decided in 1936. 298 U. S. 573. Wyoming contended that while the decree fixed the amount of the diversions under the meadowland appropriations in Colorado at 4250 acre feet, the actual diversions had ranged from 36,000 to 62,000 acre feet. Colorado answered that the greater part of this water was returned to the stream through surface drainage and percolation and that the part actually consumed did not exceed the amount which the decree allowed. The Court said that the amount of 4250 acre feet had been fixed as the measure of the meadowland appropriations because it was deemed sufficient for that purpose "when the water is rightly and not wastefully applied." The Court referred to the wasteful process that had been used. It was said that when water is so applied a considerable portion ultimately finds its way back into the stream, but that it was also true "that a material percentage of the water is lost by evaporation and other natural processes and there is no way of determining with even approximate certainty how much of the water returns to the stream." The Court then held that the decree referred to the water taken from the stream "at the point of diversion, and not to the variable and uncertain part of it that is consumptively used." As it was plainly shown that diversions were being made under the meadowland appropriations in quantities largely in excess of the amount fixed in the decree, an injunction issued forbidding further departures from the decree in that regard. *Id.*, pp. 581, 582.

With respect to the request for an order permitting Wyoming to install measuring devices for the purpose of

determining the amount of water diverted in Colorado,
the Court recognized that the problem of measuring and
recording the diversions was a difficult one and the hope
was expressed that the two States by coöperative efforts
would find a satisfactory solution. Leave was granted to
Wyoming to make a later application if the States were
unable to agree. *Id.*, pp. 585, 586. It seems that measuring devices have been installed.

While an injunction was thus granted with respect to
diversions for the meadowland appropriations in excess
of 4250 acre feet, this was manifestly upon the assumption
that Colorado was otherwise using the total amount of
water allocated to that State. That it was not intended
to restrict Colorado in determining the use of the water
of the river, according to Colorado laws and adjudications,
provided the diversions did not exceed the aggregate
amount of 39,750 acre feet to which Colorado was entitled, is clear from the ruling upon another branch of
the case. It appeared that the diversion for the Skyline
Ditch had been above the amount allowed therefor, but
that other diversions were less, so that, eliminating the
excessive meadowland diversions, the aggregate allowance
to the State would not be exceeded. Hence the Court
found that it must consider Colorado's contention "that,
consistently with the decree, she lawfully may permit diversions under any of the recognized appropriations in
excess of its accredited quantity, so long as the total diversions under all do not exceed the aggregate of the
quantities accredited to them severally." *Id.*, p. 583.

The Court noted that in both Colorado and Wyoming
water rights were transferable and that the use of the
water may be changed from the irrigation of one tract to
the irrigation of another, if the change does not injure
other appropriators; that these rules were but incidental
to the doctrine of appropriation, prevailing in both

580

States, upon which the decree had been based. The Court observed that it was not its purpose "to withdraw water claims dealt with therein from the operation of local laws relating to their transfer or to restrict their utilization in ways not affecting the rights of one State and her claimants as against the other State and her claimants." It was found that the diversions through the transmountain ditches had been made with the consent of the owners of the water rights and with the full sanction of Colorado, and hence the situation was not different from what it would have been if the owners of other claims had formally transferred parts of their water rights to the Skyline owners. The Court said: "But the Skyline owners are now permitted by the owners of the other claims and by Colorado to take and use part of the waters included in those claims. Wyoming and her claimants are in no way injured by this. No departure from the decree is involved. The thing which the decree recognizes and confirms is 'the right of the State of Colorado, *or of anyone recognized by her as duly entitled thereto,* . . . to divert and take'. the water included in the designated appropriations." The Court concluded that in the circumstances shown the Skyline Ditch diversions did not constitute an infraction of the decree. *Id.,* pp. 584, 585.

It is plain that the principle of this ruling, as applied to the transmountain appropriations which diverted the water of the Laramie river to another watershed, would certainly also apply to the meadowland appropriations within the same watershed, where part of the water diverted may find its way back to the stream. The limitation of the meadowland appropriations to 4250 acre feet was to keep the diversions in Colorado within the amount allowed to that State, not to prevent the distribution of the water thus allowed, according to Colorado

laws, where there was no infraction of the rights of Wyoming and her water claimants.

We conclude that the decree is not violated in any substantial sense so long as Colorado does not divert from the Laramie river and its tributaries more than 39,750 acre feet per annum.

In 1929, however, Colorado diverted more than that total amount. Apparently no question had been raised by Wyoming as to the diversions in 1937 and 1938. It is undisputed that when the diversions in 1939 reached 39,865.43 acre feet on June 19th, Colorado closed the headgates of the various appropriations within that State. But Wyoming alleges that Colorado wrongfully permitted the headgates to be reopened on June 22d and to remain open until July 11th, thus permitting the diversion of 12,673 acre feet in excess of the aggregate amount allowed to Colorado, despite Wyoming's protest. That there was this excessive diversion is not controverted.

Colorado insists that Wyoming has not been injured. But such a defense is not admissible. After great consideration, this Court fixed the amount of water from the Laramie river and its tributaries to which Colorado was entitled. Colorado is bound by the decree not to permit a greater withdrawal and, if she does so, she violates the decree and is not entitled to raise any question as to injury to Wyoming when the latter insists upon her adjudicated rights. If nothing further were shown, it would be our duty to grant the petition of Wyoming and to adjudge Colorado in contempt for her violation of the decree.

But Colorado insists that the diversion of more than the allocated total during the season of 1939 was with Wyoming's acquiescence. That is the sole available defense. To support it, Colorado has presented affidavits showing communications between an association of

meadowland appropriators and the special hydrographer of Wyoming and also stating that at a conference in the office of the Governor of Colorado on July 1, 1939, the officers of Wyoming said that they had no objection to continued diversions being made through the meadowland ditches for the reason that a great portion of the water so diverted returned to the Laramie river to be used downstream by Wyoming appropriators. Wyoming presents affidavits to the contrary, setting forth her demands. It is unnecessary to review in detail the points in controversy. In the light of all the circumstances, we think it sufficiently appears that there was a period of uncertainty and room for misunderstanding which may be considered in extenuation. In the future there will be no ground for any possible misapprehension based upon views of the effect of the meadowland diversions or otherwise with respect to the duty of Colorado to keep her total diversions from the Laramie river and its tributaries within the limit fixed by the decree.

For the reasons stated, the petition of Wyoming is denied, the costs to be equally divided.

*Petition denied.*